NOTICE
Decision filed 07/08/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190392-U

NO. 5-19-0392

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 05-CF-20 |
| | ) | |
| KARIN HARGRAVE, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Wharton and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm the trial court's denial of the defendant's amended petition for relief from judgment filed pursuant to section 2-1401(b-5) of the Civil Code because the record contradicts the allegations in the amended petition that no evidence of domestic violence was presented at the defendant's sentencing hearing and that the purported new evidence of domestic violence against the defendant was material and noncumulative to other evidence offered at the defendant's sentencing hearing, and was of such a conclusive character that it would likely have changed the sentence imposed by the original trial court.

¶ 2   The defendant, Karin Hargrave, now known as Karin Anderson, appeals the trial court's order denying her amended petition for relief from judgment filed pursuant to section 2-1401(b-5) of the Code of Civil Procedure (Civil Code) (735 ILCS 5/2-1401(b-5) (West 2018)). The defendant argues the trial court should have granted her petition and

1

ordered a new sentencing hearing because no domestic violence evidence was presented at her sentencing hearing. The defendant further argues that the trial court's denial of her amended petition was improper because, on the petition's face, it was clear that she was entitled to relief as a matter of law. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Following a bench trial, the defendant was convicted of three counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2004)). The defendant's nine-year-old daughter, K.K., was the victim. The charging instrument indicated that the offenses occurred sometime in November 2004 to December 2004. Count I alleged that the defendant's then-husband, James Hargrave (Hargrave), placed his penis in K.K.'s mouth, and that the defendant aided and abetted Hargrave in the commission of this offense. Count II alleged the defendant placed her mouth on K.K.'s vagina. Count III alleged that the defendant allowed K.K. to place her mouth on the defendant's vagina. The parties are familiar with the facts elicited at the defendant's bench trial, which are set forth in greater detail in this court's prior order (*People v. Hargrave*, 385 Ill. App. 3d 1153 (2007) (table) (unpublished order under Supreme Court Rule 23)), and need not be repeated at length here. Therefore, only those facts relevant to the disposition of this appeal are repeated.

¶ 5     The State's evidence at trial showed that the defendant and Hargrave, a former corrections officer, engaged in a scheme to get K.K. away from her biological father, James Kukuk (Kukuk). The defendant and Hargrave decided to teach K.K. sexual behavior and then make accusations against Kukuk, so that K.K. could accurately describe those acts in a courtroom. According to Hargrave, the scheme began in the "late spring, early summer

2

of 2004." Hargrave testified that he observed the defendant and K.K. perform oral sex on each other. He also observed the defendant and K.K. simultaneously use vibrators on themselves and each other. Hargrave further testified that the defendant taught K.K. how to perform oral sex, and that K.K. would perform oral sex on Hargrave. Sometime in November 2004, the defendant and K.K. were both naked in bed with Hargrave and took turns performing oral sex on him. Hargrave testified that he did not threaten or force the defendant to participate in the sexual acts involving K.K.

¶ 6     During the course of this scheme, Hargrave took photographs and videotaped sex acts between he and K.K. The defendant was not involved in taking the photographs or the videotaping. The photographs were taken so that the images could be altered to make it appear as if Kukuk was the perpetrator and could then be planted in his home or vehicle. Hargrave was not aware of whether photographs of the defendant and K.K. were taken and testified that he never saw any photographs of the defendant and K.K. engaged in sexual activity.

¶ 7     K.K. testified that Hargrave sexually abused her for many months. K.K. also testified that the defendant was sometimes involved in the sexual acts. K.K. did not recall engaging in sexual acts without Hargrave present. K.K. testified that the defendant and Hargrave told K.K. they had to engage in these activities to set up Kukuk so that he would leave them alone and go to prison. During her testimony, K.K. indicated that Hargrave was violent.

¶ 8     The sexual abuse of K.K. came to light on January 18, 2005, when the defendant contacted law enforcement to report that Hargrave had been sexually abusing K.K. The

3

defendant obtained a key to the safe where Hargrave kept the pictures and videos and provided these items to the police. The defendant did not inform the police of her involvement in the sexual acts with K.K. After the police became involved, Hargrave advised them of the defendant's participation in the sexual acts with he and K.K.

¶ 9 The police again interviewed the defendant. In a written statement, the defendant alleged Hargrave was demanding, violent, and controlling. The defendant claimed that Hargrave had K.K. use a vibrator, and the defendant told K.K. "to just do what she had to" in order to keep Hargrave from hurting them. The defendant also claimed that Hargrave had hit her one time, put a gun to her head, and threatened to shoot the defendant in the head. The defendant further alleged Hargrave made her do several sexual things with him and posted photographs of the defendant on the internet.

¶ 10 The police also interviewed K.K. twice regarding the incidents of sexual abuse. In her first interview, K.K. described the sexual abuse inflicted upon her by Hargrave. In her second interview, K.K. was initially afraid to provide information regarding the defendant's involvement because K.K. was afraid of getting her mother into further trouble. Eventually, K.K. disclosed the defendant's involvement in the sexual acts. K.K. told the investigator that Hargrave had forced the defendant and threatened physical violence if she did not participate. K.K. testified that she lied about Hargrave threatening the defendant.

¶ 11 The parties stipulated to the admission of a psychological evaluation report completed by Dr. Fred Klug, a psychologist. The purpose of the report was to determine whether the defendant had a mental diagnosis and could protect her daughter from abuse. Dr. Klug's report noted that the defendant was married multiple times. She claimed her

4

second and third husbands were abusive. The defendant reported that after she married Hargrave, her fourth husband, "he became highly controlling about nearly everything." The defendant attributed her failure to protect K.K. on her fear of Hargrave. Dr. Klug concluded his report by finding the defendant should have neither custody nor visitation with K.K.

¶ 12 Gary Lemmon, a licensed clinical social worker, conducted a sex offender evaluation of the defendant. She told Lemmon that she and Hargrave provided sexually explicit information to K.K. that progressed to K.K. watching sexual activity between the defendant and Hargrave. This eventually led to K.K. engaging in sexual contact with the defendant and Hargrave. Lemmon opined that the defendant experienced sexual arousal and gratification during the sexual acts with K.K. and Hargrave. The defendant told Lemmon that her initial motivation for the plan was for Kukuk to not have custody of K.K. As the plan progressed, she claimed that she "did that because she was intimidated and fearful" of Hargrave. Lemmon testified that the defendant had stated multiple times that she was intimidated by Hargrave and offered several reasons. The defendant stated there were several weapons in the household and that Hargrave had put a gun to the defendant's head one time. The defendant alleged that Hargrave claimed to mistreat prisoners where he worked and showed the defendant photographs of people who had been killed. The defendant further alleged that Hargrave stated that a restraining order would not stop a bullet and that he would kill the defendant. Hargrave also stated that he could kill his son, and nobody would find the body.

¶ 13    The defendant testified that she did not agree to engage in the scheme described by Hargrave. According to the defendant, Hargrave approached her in the spring of 2004 with the idea to take pictures of K.K. and plant them in Kukuk's home or vehicle. The defendant testified she told Hargrave the idea was "stupid" and did not agree to it. The defendant claimed that unbeknownst to her, Hargrave went ahead with the plan on his own. The defendant testified that after Thanksgiving in 2004, she learned Hargrave may have been abusing K.K. The defendant asked K.K. about the abuse, but K.K. initially denied anything happened. The defendant stated that in December 2004, K.K. told the defendant what had happened, and in January 2005, K.K. informed the defendant that Hargrave had taken photographs of her that were stored on a memory card in a safe.

¶ 14    The defendant admitted that she and K.K. performed oral sex on Hargrave but claimed he had threatened to kill K.K. and the defendant if she did not comply. The defendant testified Hargrave was sitting on the bed with a gun when he stated this. The defendant denied that she and K.K. performed oral sex on each other and stated they faked performing the oral sex. The defendant also denied teaching K.K. how to perform oral sex on a man or woman or how to use a vibrator. The defendant testified that she was compelled by Hargrave to engage in the sexual acts with K.K. and that she believed, had she not participated, Hargrave would have killed K.K. and the defendant. The defendant testified that "[e]verybody in the household had to do what [Hargrave] wanted, when he wanted, how he wanted, or you paid and you paid hard."

¶ 15    Dr. Michael Althoff, a specialist in forensic psychology, testified for the defendant. Dr. Althoff was hired to evaluate the defendant to understand her behavior with respect to

6

the allegations due to the circumstances surrounding her life prior to and during the times that the alleged offenses occurred. Dr. Althoff interviewed the defendant, reviewed reports, and performed psychological tests. He testified that the defendant engaged in dissociative practices typical of those who have experienced trauma, meaning that the defendant was unable to experience strong emotions. Dr. Althoff stated that there were indications the defendant was also experiencing depression and struggling with intrusive experiences and recollections of distressing past events. Dr. Althoff testified that over the course of the defendant's marriage to Hargrave, there was physical, psychological, and sexual abuse. Dr. Althoff stated that Hargrave subjected the defendant to behaviors such as running to the mailbox nude, having sex in public places, and placing pictures of the defendant on the internet. Dr. Althoff stated this gradually progressed over time and led to Hargrave's involvement with K.K., eventually culminating in sexual activity involving K.K.

¶ 16    Dr. Althoff conducted a series of tests on the defendant. These tests indicated the presence of depression, anxiety, suspiciousness, distrust, and feelings of victimization. The defendant also had a dependent personality and tended to acquiesce and comply to avoid conflict in situations where pressure or influence was exerted on her. One of the tests, which was designed to look at the nature and extent of psychological maltreatment women experience in intimate relationships, indicated a significant degree of isolation, domination, verbal abuse, and degradation in the defendant's relationship with Hargrave and her three previous husbands.

¶ 17    Dr. Althoff diagnosed the defendant with posttraumatic stress disorder (PTSD), chronic in nature and present over the years, and dysthymia, a form of depression that

7

includes long-term feelings of low self-esteem, subjective distress, and sadness. He also diagnosed defendant with dependent personality disorder, which he described as an enduring pattern of behavior in which she tends to be fearful of being alone, has difficulty expressing disagreement, and seeks validation for her self-worth in others. He stated that the defendant goes to extensive efforts to obtain nurturance and reassurance from partners, even to the point of being maltreated. Dr. Althoff noted the defendant had an "overly close" relationship with K.K.

¶ 18    Dr. Althoff concluded that "looking at what all happened in a progressive collective kind of way," the defendant felt she had no other choice but to perform the alleged sexual acts with K.K. Dr. Althoff explained that individuals who have been subjected to chronic psychological maltreatment over a course of years have their sense of self eroded, which has been termed a "psychological death." Dr. Althoff added that he believed the prolonged victimization that occurred over the years was a significant factor. He stated the defendant told him that she felt she would be killed if she and K.K. did not participate in the sexual acts. Dr. Althoff opined that the constant fear of something bad happening that may lead to the death of the defendant or K.K. was a factor that significantly contributed to what occurred.

¶ 19    Dr. Althoff was critical of Dr. Klug's report. Dr. Althoff testified that it appeared Dr. Klug did not consider "to any significant degree" the physical, psychological, and sexual abused the defendant endured. Dr. Althoff opined that Dr. Klug's report suggested Dr. Klug was either dismissive or not attentive to the abuse.

8

¶ 20    The trial court found the defendant guilty of all three counts of predatory criminal sexual assault of a child. The trial court rejected the defendant's assertion that she was compelled to engage in the conduct alleged in count I. The trial court found the defendant had not shown she acted under a threat of imminent infliction of death or great bodily harm. As to counts II and III, the trial court found that K.K. provided credible testimony that the defendant performed oral sex on K.K. and allowed her to perform oral sex on the defendant. The trial court ordered that a presentence investigation report (PSI) be prepared for sentencing.

¶ 21    In her interview for the PSI, the defendant alleged she and K.K. were forced to engage in the sexual activity. The defendant indicated that she believed Hargrave had a loaded gun and would use it. The defendant reported that she never did anything willingly and had no other choice. The PSI indicated that evaluations by Dr. Klug, Dr. Althoff, Lemmon, and Dr. Seth Hatlelid, who completed a sex offender evaluation and risk assessment of the defendant, were attached to the PSI and made a part of the report.

¶ 22    In Lemmon's report, which was not admitted at trial, he indicated that despite the defendant's subjective fears of Hargrave, she had the ability and resources to protect K.K. from abuse. Lemmon opined that the defendant would not have initiated any sexual contact with K.K. without the influence of another person. Lemmon cited "emotional enmeshment" between the defendant and K.K. as a possible explanation for the defendant's inclusion of K.K. in her "poor decision-making" and sexual behavior.

¶ 23    The defendant met with Dr. Hatlelid because the defendant wanted a second opinion regarding a sex offender evaluation. Dr. Hatlelid's report provided that the defendant

9

claimed she was frightened by Hargrave's violence and did whatever he asked as a way to protect herself and K.K. The defendant alleged Hargrave threatened to take K.K. away if the defendant refused. The defendant reported that Hargrave became violent because she was not doing enough to get Kukuk out of their lives. The defendant alleged the violence became so severe that she and K.K. would try to keep Hargrave happy all the time. The defendant told Dr. Hatlelid that Hargrave sexually abused her and forced her to perform sexual acts against her will. As an example, the defendant alleged that Hargrave wanted the defendant to have intercourse with the family dog, but the defendant refused to do so. She did not indicate why she was able to refuse intercourse with the dog but was unwilling or unable to refuse performing sexual acts with K.K.

¶ 24    Dr. Hatlelid opined that although the defendant was capable of protecting K.K., the defendant chose not to do so because she feared Hargrave and had a "misguided and dependent love for him." Dr. Hatlelid noted the defendant had no physical or mental disabilities that would have prevented her from seeking help, such as obtaining an order of protection as she had done in previous relationships. Dr. Hatlelid opined that the defendant likely allowed herself to be part of the abuse because she was both dependent on and terrified of Hargrave leaving her. Dr. Hatlelid indicated that the defendant was experiencing severe symptoms of PTSD, which was likely a result of the physical, emotional, and sexual abuse she suffered from her husbands, particularly Hargrave. Dr. Hatlelid reported that as a result, the defendant operated out of a "survival mindset" in which she was willing to do whatever it took to survive in her situation at the time. Dr.

10

Hatlelid believed that the defendant met the criteria for dependent personality disorder and tolerated egregious abuses because she loved her husband and was afraid to be alone.

¶ 25    Dr. Althoff's report, which was not admitted at trial, detailed the defendant's abusive relationships with her prior partners as reported by the defendant. The report noted the defendant was exposed to physical and psychological abuse in all four of her past marriages and sexual abuse in two of those marriages. The report further noted that it was suggested that the defendant's relationship with Hargrave was the most abusive of all. The report concluded that the cumulative effect of the defendant's personality traits, her overly close relationship with K.K., the helplessness the defendant felt due to chronic depression, the effects of prolonged victimization, and the fear of great bodily harm or death compelled the defendant to compromise her judgment and engage in inappropriate sexual behavior with K.K.

¶ 26    Also attached to the PSI, among other items, were several letters submitted on behalf of the defendant. Members of the defendant's family generally asked for leniency in sentencing the defendant and indicated Hargrave isolated and intimidated the defendant. A letter from Diane Wetendorf, an advocate for women battered by law enforcement officers and consultant on the issue of police-perpetrated domestic violence, asked the trial court to sentence the defendant to the minimum sentence, urging the trial court to consider the circumstances surrounding the defendant's actions.

¶ 27    At sentencing, the trial court confirmed the parties had received copies of the PSI, addendums to the PSI, and a lengthy handwritten document authored by the defendant that the trial court received and reviewed the day of sentencing. The document was titled

11

"Abuse by James Hargrave to family." The State then presented its evidence in aggravation. In mitigation, the defendant called Lemmon. He testified that in evaluating the defendant, he believed she was a low risk of "reoffending sexually." Lemmon further testified that neither this opinion nor any of the opinions he expressed at the time of trial had changed.

¶ 28    After the parties made sentencing arguments, the defendant made a statement in allocution. The defendant apologized for the trauma K.K. had endured. The defendant stated that she realized she could have made other choices although she felt that she had no other choice at the time and did what she believed she had to so that she and K.K. could survive. The defendant further stated she felt humiliated, helpless, and psychologically frozen.

¶ 29    In sentencing the defendant, the trial court described the case as disturbing and "one of the most difficult experiences" the judge had while on the bench. The trial court indicated that the defendant sought to be treated as a "victim" or a "battered woman." The trial court rejected this notion and believed that the defendant was seeking to avoid responsibility. The trial court stated that it believed the defendant was as involved in the scheme to frame Kukuk as Hargrave, if not more so. The trial court suspected that the defendant initiated "this whole horrible project" and engaged in conduct to seduce K.K. into engaging in sexual acts with Hargrave and the defendant. The trial court indicated that it believed the defendant decided to turn in Hargrave because she discovered Hargrave was engaging in sexual conduct with K.K., without the defendant. The trial court stated, "I think she was left out and apparently hurt." The trial court continued:

12

"I thought it was interesting to note that Mr. Lemmon concluded, as I did, that it does not seem reasonable to believe that she was involved so extensively over several months in sexual behavior with her daughter present without experiencing sexual arousal and gratification.

That's a very disturbing aspect of this case, and I have struggled with trying to comprehend it. I do not think that we're dealing simply with an act of omission by a weak parent. I think she was a joint perpetrator in this case.

She claims to have been forced, but that claim I don't find convincing. The husband I would note apparently wanted her to engage in sexual contacts with a female and apparently with the family dog. She refused. There were no particular consequences to that. She was not beaten. She was not threatened with a gun. There was nothing to indicate that she did not have the ability to refuse. And she certainly had the ability to stop the conduct before it went on for eight months or longer.

I don't know how to explain [the defendant's] conduct in this case. She apparently is from a good family. She's an intelligent woman. There's no evidence of mental disability, impairment, or illness that I have seen. There is no evidence that she was physically or sexually abused as a child. She's not been shown to have been impaired on drugs or alcohol. She's a competent person. She's been a legal secretary. She was an auxiliary policeman."

The trial court found the defendant's lack of criminal history was a factor in mitigation. In aggravation, the trial court further found that the defendant's conduct caused or threatened serious permanent injury to K.K. and that a lengthy sentence was necessary to deter others. The trial court sentenced the defendant to 20 years' imprisonment on each count to run consecutively. The trial court also imposed a fine of $2500 for each count.

¶ 30    The defendant appealed her conviction and sentence arguing, among other things, that the trial court failed to consider in mitigation that the defendant had a history of abuse and maltreatment, which resulted in various mental disorders. This court affirmed the defendant's conviction and sentence.

¶ 31    The defendant filed a petition for postconviction relief. In her postconviction petition, the defendant alleged, among other things, that her defense counsel failed to investigate and call expert and lay witnesses that could have offered mitigating evidence of domestic violence at sentencing. The trial court summarily dismissed the postconviction petition. The defendant appealed. This court affirmed the dismissal of the defendant's postconviction petition.

¶ 32    The defendant filed a petition for relief from judgment pursuant to section 2-1401(b-5) of the Civil Code in which she sought a reduction of sentence or a new sentencing hearing to present mitigating evidence of domestic violence. The defendant failed to properly serve her petition upon the State, and the petition was dismissed without prejudice.

¶ 33    Next, the defendant filed a second petition for relief from judgment in which she sought a reduction of sentence or a new sentencing hearing to present mitigating evidence of mental illness. The defendant subsequently filed a motion to recharacterize her petition

14

as a postconviction petition and a motion for leave to file a successive postconviction petition. The State filed no responsive pleadings. The trial court held a hearing on the defendant's filings and indicated that it would rule on those pleadings without a written response from the State.

¶ 34    Following the hearing, the defendant filed an amended petition for relief from judgment pursuant to section 2-1401(b-5). In this petition, the defendant alleged that her participation in the offense was related to her mental illness and domestic violence perpetrated by an intimate partner and that no evidence of domestic violence was presented at her sentencing hearing. The defendant further alleged that she was unaware of the mitigating nature of the evidence of mental illness and domestic violence at the time of sentencing and could not have learned of its significance sooner through diligence. The defendant asserted the "new" evidence of mental illness and domestic violence against her was material and noncumulative to other evidence offered at the sentencing hearing, and was of such a conclusive character that it would likely change the sentence imposed by the original trial court. The defendant again sought a reduction in sentence or a new sentencing hearing at which she could present mitigating evidence of mental illness and domestic violence.

¶ 35    The defendant attached her own affidavit to the petition. The defendant alleged that she was diagnosed with PTSD, dysthymia, and dependent personality disorder. The defendant further alleged that Hargrave physically, psychologically, and sexually abused her and that prior to her marriage to Hargrave, she was in three other abusive marriages. According to the defendant, Hargrave threatened to kill her and K.K. if the defendant did

15

not participate in the sexual abuse of K.K. The defendant averred that Hargrave possessed several firearms at the time and told the defendant how he would dispose of the bodies of the defendant and K.K. The defendant indicated that she believed Hargrave's threats and feared for her and K.K.'s lives. The defendant asserted that defense counsel did not present this information for the trial court's consideration at sentencing.

¶ 36 The State again filed no responsive pleading. The trial court entered an order denying the defendant's petitions for relief from judgment, including the amended petition, and the motion to recharacterize her petition. In denying the defendant's petitions for relief from judgment, the trial court found that the defendant had presented substantial evidence of domestic abuse, including Dr. Althoff's opinions. The trial court determined that based on the record from the bench trial and the sentencing hearing, the defendant could not claim that evidence of domestic abuse was not before the court at the time of sentencing or that she was unaware of the mitigating nature of such evidence at the time. The trial court concluded that "[b]ecause such evidence was not only before the court but also formed the core of her defense, Defendant cannot meet the requirement of §2-1401(b-5)." This appeal followed.

¶ 37                                                    II. ANALYSIS

¶ 38 On appeal, the defendant argues that the trial court erred in denying her a new sentencing hearing pursuant to section 2-1401(b-5) because no domestic violence evidence was presented at her sentencing hearing. The defendant further argues that the trial court's denial of her amended petition was improper because, on the petition's face, it was clear that she was entitled to relief as a matter of law.

16

¶ 39   A proceeding under section 2-1401 provides a statutory mechanism for vacating final judgments in civil or criminal proceedings. *People v. Stoecker*, 2020 IL 124807, ¶ 18. The purpose of a section 2-1401 petition is to bring facts to the trial court's attention which, if known when judgment was entered, would have prevented the entry of the judgment. *People v. Haynes*, 192 Ill. 2d 437, 463 (2000). A section 2-1401 petition may also be used to raise a legal challenge to a final judgment or order. *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 41. It is not designed to provide a general review of all trial errors, to substitute for a direct appeal, or to obtain relief for issues previously raised at trial or in other collateral proceedings. *People v. Kane*, 2013 IL App (2d) 110594, ¶ 13.

¶ 40   Proceedings under section 2-1401 are governed by the usual rules of civil practice and are treated as complaints, inviting responsive pleadings. *Stoecker*, 2020 IL 124807, ¶ 18. The State may answer the petition, move to dismiss it, or choose not to file a responsive pleading. *Stoecker*, 2020 IL 124807, ¶ 18. As with complaints in civil proceedings, the State's failure to respond to a section 2-1401 petition constitutes an admission of all well pleaded facts and renders the petition ripe for adjudication on the pleadings alone. *People v. Cathey*, 2019 IL App (1st) 153118, ¶ 15. The trial court may decide the case on the pleadings, affidavits, exhibits, and supporting material before it, including the record of prior proceedings. *People v. Vincent*, 226 Ill. 2d 1, 9 (2007). A petition is properly dismissed where the allegations contained therein are contradicted by the record. *Cathey*, 2019 IL App (1st) 153118, ¶ 49. When a court enters judgment on the pleadings or dismisses a section 2-1401 petition, we review such order *de novo*. *Vincent*,

17

226 Ill. 2d at 18. We may affirm the trial court's decision on any basis supported by the record. *People v. Green*, 2012 IL App (4th) 101034, ¶ 30.

¶ 41    In 2016, section 5-5-3.1(a) of the Unified Code of Corrections (730 ILCS 5/5-5-3.1(a) (West 2016)) was amended to allow courts to consider evidence of domestic violence as a mitigating factor at sentencing. See 730 ILCS 5/5-5-3.1(a)(15) (West 2016). Section 2-1401 of the Civil Code was also amended to include subsection (b-5), which allows for relief from judgment based on new evidence of domestic violence. Under section 2-1401(b-5), a petitioner may present a meritorious claim if the petition establishes the following by a preponderance of the evidence: (1) the petitioner was convicted of a forcible felony; (2) the petitioner's participation in the offense was related to him or her previously having been a victim of domestic violence as perpetrated by an intimate partner; (3) no evidence of domestic violence against the petitioner was presented at his or her sentencing hearing; (4) the petitioner was unaware of the mitigating nature of the evidence of the domestic violence at the time of sentencing and could not have learned of its significance sooner through diligence; and (5) the new evidence of domestic violence against the petitioner is material and noncumulative to other evidence offered at the sentencing hearing, and is of such a conclusive character that it would likely change the sentence imposed by the original trial court. 735 ILCS 5/2-1401(b-5) (West 2018). As used in subsection (b-5), the term "domestic violence" means abuse as defined by section 103 of the Illinois Domestic Violence Act of 1986. 735 ILCS 5/2-1401(b-5) (West 2018). Abuse includes physical abuse, harassment, interference with personal liberty, or willful deprivation. See 750 ILCS 60/103(1) (West 2018).

¶ 42    Here, the defendant alleged her participation in her offense was related to mental illness and domestic violence. In her supporting affidavit, the defendant alleged she was diagnosed with PTSD, dysthymia, and dependent personality disorder. The defendant further alleged that Hargrave physically, psychologically, and sexually abused her. According to the defendant, Hargrave threatened to kill her and K.K. if the defendant did not participate in the sexual abuse of K.K. Hargrave also had several firearms and allegedly told the defendant how he was going to dispose of the defendant's and K.K.'s bodies. The defendant indicated that she believed Hargrave's threats and feared for her and K.K.'s lives. This was not new evidence of domestic violence nor was it noncumulative to the other evidence offered at the defendant's sentencing hearing.

¶ 43    At trial, the defendant asserted a defense of compulsion as to count I and the trial court heard the testimony of both the defendant and Dr. Althoff. The PSI prepared for sentencing provided that the defendant claimed she and K.K. were forced to engage in the sexual activity. The defendant reported that she believed Hargrave had a loaded gun and would use it on the defendant and K.K. The defendant claimed that she never did anything willingly and had no other choice. Attached to and made part of the PSI were the reports of Dr. Klug, Dr. Althoff, Dr. Hatlelid, and Lemmon. These reports provided the trial court with an account of the defendant's abusive relationship with Hargrave, and her prior spouses, as well as opinions as to the defendant's participation in the offense conduct. Thus, the evidence of domestic violence the defendant sought to introduce was contained in the PSI and its attachments, meaning it was not new or noncumulative to the evidence at sentencing.

19

¶ 44 The defendant claims that the domestic violence evidence was not "presented" at her sentencing hearing because defense counsel did not "put on" evidence or argue that the defendant's participation in the offenses was a result of suffering domestic violence from four different husbands. The defendant acknowledges, however, that the purported domestic violence evidence was a part of the PSI but argues that section 2-1401(b-5)'s purpose would not be served merely because such evidence was available for the court's consideration even though the record shows that the evidence was "never actually raised in court."

¶ 45 At the defendant's sentencing hearing, the trial court was required to consider the evidence received at trial and in the PSI. 730 ILCS 5/5-4-1(a)(1), (2) (West 2004). The purpose of the PSI requirement is to ensure that the trial court will have all necessary information concerning the defendant before imposing a sentence. *People v. Harris*, 105 Ill. 2d 290, 299 (1985). The PSI is to be presented to and considered by the trial court. See 730 ILCS 5/5-3-1 (West 2004). Thus, we find that the evidence of domestic violence was "presented" at the defendant's sentencing hearing for purposes of section 2-1401(b-5)(3).

¶ 46 Finally, the purported domestic violence evidence was also not of such a conclusive character that it would have likely changed the sentence imposed by the original trial court. As previously stated, the evidence referenced by the defendant in her petition and affidavit was not new. Based on the record, the trial court was well aware of the defendant's claim that she was a victim of domestic violence. When sentencing the defendant, the trial court rejected the notion that the defendant was a "victim" or a "battered woman." Instead, the trial court believed the defendant was a joint perpetrator, and was just as involved as

20

Hargrave, if not more so, in the development of the scheme to frame Kukuk. Moreover, we presume the trial court reviewed and considered the PSI. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 20. After reviewing the record of proceedings at sentencing, we cannot say that the trial court failed to review and consider the PSI. Accordingly, the record refutes the defendant's assertion that the sentence imposed by the original trial court would likely have changed.

¶ 47                                    III. CONLUSION

¶ 48     For the foregoing reasons, we affirm the judgment of the trial court.


¶ 49     Affirmed.